### 28534. UNITED STATES FIDELITY AND GUARANTY COMPANY *et al.* v. FRIED, for use, etc.

DECIDED NOVEMBER 28, 1940. REHEARING DENIED DECEMBER 20, 1940.

*Anderson & Anderson,* for plaintiffs in error.
*Hall & Bloch,* contra.

MACINTYRE, J. The director denied compensation, for the reasons that "as a matter of fact, and [he] rules as a matter of law, that the accidental injury resulting in decedent's death did not arise out of his employment; that the injury was due to his own wilful misconduct; and that it was caused by the wilful act of a third person directed against the employee for reasons personal to the employee, and therefore is not compensable." The board affirmed this award denying compensation. The judge of the superior court reversed these findings, and held that the claimant was entitled to compensation. The judge seems to have based his reversal on the theory that he construed the finding of the board to mean that the claimant was not entitled to recovery because the deceased was an "aggressor," and that he was of the opinion that "as a matter of law that Fried [the deceased] was not the aggressor in the unjustifiable assault and battery which precipitated his heart attack," for he had not violated Code, § 26-

6303, in using the language about Woodward in the presence of Bush. The judge reversed the board on the further ground that there was no evidence of "wilful misconduct" as that term is defined in *Ætna Life Insurance Co.* v. *Carroll,* 169 *Ga.* 333, 341 (150 S. E. 208) ; and further, that there was not a vestige of evidence that the deceased at any time before the assault was acting outside of his employment.

We think the judge erred in so ruling. It is a settled rule that an injury may arise in the course of the employee's employment and yet not arise out of his employment. Conceding that the injury here arose in the course of the decedent's employment, we are of the opinion that it did not arise out of the employment. Code, § 114-102, provides: "'Injury' and 'personal injury' shall mean only injury by accident arising out of and in the course of the employment and shall not include a disease in any form except where it results naturally and unavoidably from the accident, *nor shall 'injury' and 'personal injury' include injury caused by the wilful act of a third person directed against an employee for reasons personal to such employee."* (Italics ours.) The injury in this case comes clearly within the exception as one "caused by the wilful act of a third person directed against an employee for reasons personal to such employee." The director based his decision partly on this exception, and not on the theory of the deceased being the "aggressor," as seems to have been the opinion of the judge. Furthermore, under the ruling by this court in *Scott* v. *Travelers Insurance Co.,* 49 *Ga. App.* 157, 165 (174 S. E. 629), the claimant is not denied compensation in *every* case merely because he (or the deceased for whose death claim for compensation is made) is *in fact* the "aggressor" in a fight or difficulty with a coemployee or a third person, for, with regard to injuries under the workmen's compensation act, where the injured employee is the "aggressor" no rigid rule can be laid down that will be sound under all the circumstances that may arise. Whether the claimant can recover where he is the "aggressor" depends on the facts and circumstances of each case. Therefore, the instant case, not having been decided by the director on the theory of the deceased being the "aggressor," whether he was the "aggressor" or not becomes immaterial, for the evidence amply authorized the finding of the director that the injury did not arise out of his employment but was caused by the

wilful act of a third person directed against the employee for reasons personal to him.

Whether the deceased was guilty of wilful misconduct under the workmen's compensation act or not (which was one of the reasons the director found as he did) need not be decided, for if the finding of the director, which was affirmed by the board (that the injury did not arise out of the employment but as the result of a wilful act of a third person personal to or against such deceased employee), was based on evidence before the director, which evidence supported his finding that the death did not arise out of his employment, the application of a wrong principle of law would not require the superior court or this court to reverse the award of the director which was approved by the board. *United States Casually Co.* v. *Scott,* 51 *Ga. App.* 115 (179 S. E. 640); *Peninsular Life Insurance Co.* v. *Brand,* 57 *Ga. App.* 526 (196 S. E. 264); *Milam* v. *Ford Motor Co.,* 61 *Ga. App.* 614, 617 (7 S. E. 2d, 37); *South* v. *Indemnity Insurance Co.,* 41 *Ga. App.* 827 (155 S. E. 48); *Hightower* v. *U. S. Casualty Co.,* 30 *Ga. App.* 123 (117 S. E. 98); *Crittenden* v. *Southern Home Building & Loan Asso.,* 111 *Ga.* 266 (5), 272 (36 S. E. 643). In the words of the Supreme Court in *Summerlin* v. *Hesterly,* 20 *Ga.* 689 (65 Am. D. 639), "A judgment that is right remains right, notwithstanding that the court rendering the judgment may assign a wrong reason for it."

It appears that the claimant's husband, Mr. Theodore D. Fried, was employed by Fried's Garage as manager of the tire department. As such manager he had exclusive charge of sales and collections and had no certain hours of duty, being allowed to work at any time he pleased. Some time before April 25, 1939, Fried had sold some tires to one T. P. Woodward on credit for which he had not collected. In the early afternoon of April 25, Fried went to a gasoline station owned and operated by Gordon Bush, in the City of Macon, where he hoped to contact Woodward. This was a station where Woodward at times traded. Fried asked Bush whether he knew where Woodward was, and was told that Woodward had not been in the station that day. Fried left and later that afternoon, about four o'clock, returned to inquire a second time about Woodward, and was told that Woodward had been to the station since Fried's first visit, and that on being advised that Fried was looking for him Woodward had said he was going to Cordele, Georgia, to

get some money with which to pay for the tires. Fried then left. Woodward lived at the same house as did Bush, which was the home of the sister of Lawrence Kane, a bookkeeper for Mr. Bush. About 8:30 o'clock that night Fried drove up in his car with his wife. parked in front and went into the station, his wife remaining outside.

Bush, the person who assaulted the deceased, testified that the following occurred: "At approximately 8:30 that night I was pretty busy, and I had my supper sent to me, and I was in my little office eating supper when Mr. Fried came in. I didn't see him drive up at all. When I saw him I saw him coming in the door. When he came in the door, he said, 'Where is Tommy Woodward?' Mad and loud too. I said, 'I told you this afternoon Tommy had gone to Cordele.' He said, 'You tell Tommy Woodward I am going to send the sheriff down after him.' When he said that, a man who worked for me spoke up and said, 'You can't send a sheriff after anybody. If you put everybody in jail that owes bills, there wouldn't be enough jails to hold half of them.'" Q. "Was Mr. Fried using curse words?" A. "He was very ugly and cursing, and wasn't treating any of us with respect at all." Q. "How many times did he curse there, would you say?" A. "I would say he used at least half dozen or more. Mr. Kane. he and Fried argued, and Kane raised up and pulled off his glasses and I knew by his actions that business was going to pick up, and I said, 'Let's not have any trouble at all.' Kane sat on back down and I went back to eating supper." Q. "Had Mr. Fried used any curse words then?" A. "He had been very nasty all the way through. The next part of the conversation was betwixt he and a customer of mine, Freeman. When he and Freeman got in a heated argument I got mad, and I got up and told him to get out, that he had already worried me too much about Tommy Woodward already, and I wanted him to get out, and I asked him several times to get out, and he didn't get out and I put him out. . . I shoved him out the door. . ." Q. "Why did you push him?" A. "On account of the way he acted." Q. "You mean what you have just described?" A. "Yes, sir." Q. "On account of his loud cursing words?" A. "Anybody in the room would have done the same thing I did." Q. "Was he talking very loudly?" A. "Yes, sir." Q. "Did you have any spite or feeling of ill

will against Fried's Garage?" A. "No, sir. I had never had any dealings with them, except Mr. Milton Fried did start to give me a job one time and I appreciated it." Q. "Did you have any reason to try to prevent them from collecting this account?" A. "No, sir, I would have liked to have seen him collect it." Q. "That didn't enter at all into you pushing him out?" A. "No, sir, neither way."

Kane, assistant to Bush, on being asked to tell what happened when Mr. Fried, the deceased, came into the filling-station that night, testified: "He came in the door. I knew him by sight. He walked in and put one hand on the wall and looked at Bush and said, 'Where is Tommy Woodward?' Gordon [Bush] looked up and said, 'I told you this afternoon that Tommy Woodward had gone to Cordele.' I don't remember what words he used. He was very rude with it. He didn't say 'good evening' or anything. He walked in there out of a clear sky and said, 'Where is Tommy Woodward?' . . When Bush told him he had gone to Cordele, he said, 'I will be ——— damned if I am not going to send the sheriff over there to get him.' I didn't know what the thing was all about at the time. I turned around and I said, 'You look like sending the sheriff after somebody that owes you. If they put everybody in jail that owed money, there wouldn't be enough jails to hold them.' He said, 'I will be damned if that is so.' Then I said, 'You can take out a court order and get the tires, but anybody could get bond.' About every other word was a ——— damned or damn. You could hear him all over the place, just dictatorial. Bush hadn't said any more. He was still eating his supper. About that time one of our customers [C. B. Freeman] who was in there, he said, 'No, you couldn't get the tires without a court order.' He began to get in an argument with him about it. . . I didn't like Fried's attitude at all. It was a third party [who owed the money] that didn't concern us whatever. . . Then I stood up; I was sitting down there. His attitude was crude, and Bush saw I didn't like it and Bush told Fried, 'I would like for you to get out this place. You have been worrying me about this. Tommy doesn't stay here.' He [the deceased] said, 'I'll be damned if I ain't going to have my money.' Bush got up and said, 'I told you to get out of here.' . . Then, when he told him the second time, he still was in an argumentative mood, and Bush got him by the

nape of the neck and caught him by the belt and literally threw him out the door. He didn't fall. He ran. He got about as far as from here to the corner of the wall and said, 'If I wasn't a sick man I would fight the hell out of you.' Bush started walking on out there, and he broke and ran to the car and his wife called him about that time."

C. B. Freeman, on being asked to tell what happened on the occasion in question, testified: "Mr. Fried came in Bush's station, and Mr. Bush was sitting there eating supper, and there was a little counter about like this, and there was a cash register here, and here was the door going around in the office. Fried stood right here nearly all the time and was talking very vulgar." Q. "What did he say?" A. "First he asked Mr. Bush where was Tommy Woodward." Q. "What was his tone of voice and actions?" A. "Loud. Bush told him, 'I told you this afternoon that Woodward had gone to Cordele and it would be a day or two before he got back.' He got to talking then and kept talking, and Bush took about all he wanted to take. . . There wasn't any argument, it was just Fried talking. . . Bush said, 'Fried, I would rather you would get on out of the place. I have heard enough out of you.' Fried just kept talking. Bush told him again to get out, and he kept talking, and when he did Bush got up and walked over to him and took him like he did there a while ago and shoved him out the door." He further testified that about every other word the deceased spoke was a curse word.

This case does not come under that class of cases where the claimant seeks to recover for an accident (an altercation from which the injury resulted) which arose out of the employment, that is, because of it, as when the employment is a contributing, proximate cause. *Employers Liability Assurance Cor.* v. *Woodward, 53 Ga. App.* 778 (187 S. E. 142). But here the conduct of Bush, the third party, was not directed at the deceased because of ill will that was in any way related, or, if it was related, remotely related, to the bill or its attempted collection. It was not incidentally, in any material way, connected therewith; but the cause of the ill will was the loud and profane language and conduct of the deceased in the third party's place of business. The gravamen of the charge of misconduct, that is, the misconduct specially complained of in the altercation which resulted in the injury, was not

proximately related to the fulfillment of the duties of the employee to the employer, and the misconduct was not naturally or proximately incidental to the employment of Fried by Fried's Garage. The loud and profane language and conduct of the deceased in Bush's place of business were something primarily and naturally incidental to an ill effect on the business of Bush, and his (Bush's) ill will was directed at the employee's language and conduct as they related to his (Bush's) business and to Bush personally. The ill will was not directed at the employee's language and conduct as they related to the business of Fried's Garage, the employer of Fried. It is true that but for the employment of Fried as bill collector for Fried's Garage the deceased and Bush might never have been brought together, yet the altercation from which the injury resulted arose because the deceased refused to leave Bush's place of business, when requested so to do on account of the loud and profane language and misconduct of the deceased, and because of the anger of Bush by reason thereof. Scholtzhauer *v.* C. & L. Lunch Room, 233 N. Y. 12 (134 N. E. 701); Mercantile Commercial Bank *v.* Koch, 83 Ind. App. 707 (150 N. E. 25); Gray's case, 123 Maine, 86 (121 Atl. 556); 29 A. L. R. 441; *Keen* v. *New Amsterdam Casualty Co.,* 34 *Ga. App.* 257, 259 (129 S. E. 174); *Pinkerton National Detective Agency* v. *Walker,* 30 *Ga. App.* 91, 95 (117 S. E. 281); *Hightower* v. *U. S. Casualty Co.,* supra; *Lanier* v. *Brown,* 44 *Ga. App.* 831 (2) (163 S. E. 263).

In other words, from the testimony above set out, we think the director, whose award was affirmed by the board, was authorized to find that the death of the claimant's husband resulted from the wilful act of a third person, Bush, directed against him for reasons personal to the employee, Fried. That is, the director was authorized to say that Bush became provoked with the deceased and threw him out of his filling-station, resulting in his death because of the deceased's attitude and conduct in Bush's place of business, because of his repeated use of loud and profane language, his argumentative mood and attitude, and his refusal to leave the place of business of a third person when requested by him to do so. This, we think, was an injury occurring and resulting from a personal altercation between the deceased and the third person, and clearly comes within the exception stated in Code, § 114-102, supra, which excludes "injury caused by a wilful act of a third person directed

against an employee for reasons personal to such employee." *Hightower* v. *United States Casualty Co.*, supra; *Kimbro* v. *Black & White Cab Co.*, 50 *Ga. App.* 143 (177 S. E. 274). The director, whose award was affirmed by the board, properly denied compensation, and the judge erred in reversing the findings of the director which were affirmed by the board.

*Judgment reversed. Broyles, C. J., and Gardner, J., concur.*

ON MOTION FOR REHEARING.

MacINTYRE, J. The cases cited by the claimant as controlling in this case are distinguishable from the instant case. Among the cases cited is *Schwartz* v. *Nunnally Co.*, 60 *Ga. App.* 858 (5 S. E. 2d, 91). In that case the court merely held that a question of fact was presented as to whether the assault on the plaintiff arose out of the business of the employment, that the judge erred in granting a nonsuit, and that the question should have been presented to a jury. In the instant case a similar question of fact was presented and the fact-finding body found in favor of the defendants. The evidence authorized this finding and the judge erred in disturbing it.

*Rehearing denied. Broyles, C. J., and Gardner, J., concur.*